UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

JERRY A. F.,

                    Plaintiff,

      v.

ANDREW SAUL,
COMMISSIONER OF SOCIAL
SECURITY

                Defendant.

Case No.   1:19-CV-00088-AC
OPINION AND ORDER

_____

ACOSTA, Magistrate Judge:

Plaintiff Jerry A. F.[1] ("Plaintiff") filed this action under section 205(g) of the Social Security Act (the "Act") as amended, 42 U.S.C. § 405(g) (2018), to review the final decision of the Commissioner of Social Security (the "Commissioner") who denied his applications for social

---

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the middle and last name of the non-governmental party in this case.

security disability insurance benefits ("DIB") and supplemental security income ("SSI") (collectively "Benefits"). The court finds the Commissioner erred in rejecting Plaintiff's testimony and by failing to provide clear and convincing reasons for doing so. Accordingly, the Commissioner's final decision is reversed and remanded for further proceedings consistent with this Opinion and Order.

*Procedural Background*

On or January 28, 2015, Plaintiff filed an application for DIB, and on or about February 16, 2015, Plaintiff filed an application for SSI, alleging an onset date of January 1, 2013. The applications were denied initially, on reconsideration, and by Elizabeth Watson, the Administrative Law Judge (the "ALJ"), after a hearing. The Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner.

*Factual Background*

Plaintiff is fifty-four years old. He graduated from high school and completed a four-year electrical apprenticeship. He has never been married. His past relevant work experience includes working as a journeyman electrician. Plaintiff has not been involved in a successful work attempt since January 1, 2013. He originally alleged disability because of severe arthritis, deformed feet, migraine headaches, high blood pressure, severe depression, and cirrhosis of the liver. Plaintiff last met the insured status requirements of the Act through December 31, 2016.

I.    Testimony

Plaintiff claims he became unable to work on January 1, 2013, because of his disabling conditions. (Tr. of Social Security Administrative R., ECF No. 11 ("Admin. R."), at 205.) Plaintiff stopped working on September 1, 2012, because of his feet and headaches. (Admin. R.

at 61, 222.)    Plaintiff claims his conditions limit his ability to work because he is not able to climb, stand for any length of time, walk around, crawl around, or dig.    (Admin. R. at 232.)

Plaintiff has deformities in both feet.    (Admin. R. at 63.)    Both of his big toes are pointed completely out.    (Admin. R. at 62.)    He claims his big toe on one foot is underneath the other toes such that he is stepping on it continually, which causes constant pain.    (Admin. R. at 62.) The condition also causes stabbing pain and swelling, and the swelling in turn causes migraine headaches.    (Admin. R. at 62.)    Once the stabbing pain starts, Plaintiff claims the swelling begins approximately ten minutes later and continues for approximately twelve hours.    (Admin. R. at 65.)    On his other foot, the condition pushes his toes over instead of going underneath.    (Admin. R. at 63.)    Plaintiff claims he has had the condition with his foot for the past eight or nine years, and that it has grown worse with the work he did.    (Admin. R. at 61.)    Plaintiff wears special orthotics shoes for the condition, and may be fitted for another shoe; however, Plaintiff reports even with the shoes, it is difficult to stand on his feet.    (Admin. R. at 65.)

Plaintiff also experiences migraines at least twice a week.    (Admin. R. at 71.)    The headaches last for eight-to-ten hours, depending on whether he can get to sleep.    (Admin. R. at 72.)    When a migraine occurs, Plaintiff tries to find a dark room.    (Admin. R. at 72.)    Plaintiff takes gabapentin and ibuprofen three times per day as prescribed, which results in drowsiness as a side effect.    (Admin. R. at 69.)

Before he stopped working, Plaintiff did electrical work.    (Admin. R. at 242.)    For this work, Plaintiff had to walk, stand, climb, reach, stoop, kneel, crouch, crawl, handle, grab or grasp big objects, and write, type or handle small objects.    (Admin. R. at 242.)    Plaintiff also had to lift and carry "wire, lights, cages of boxes, electric [sic] equipment, and pipe all over the job site when

needed, everyday." (Admin. R. at 242.) Plaintiff frequently lifted twenty-five pounds, and the heaviest weight he lifted was one-hundred pounds or more. (Admin. R. at 242.) Plaintiff spent eight or more hours on his feet as an electrician. (Admin. R. at 66.)

Plaintiff reports his conditions affect his ability to lift, squat, stand, walk, kneel, stair climb, and complete tasks. (Admin. R. at 237.) With stooping, crouching, and crawling, Plaintiff claims going down on his toes results in instant pain. (Admin. R. at 72.) Plaintiff claims using stairs or a ladder puts more pressure on the part of his foot where the stabbing pain occurs. (Admin. R. at 68.) Plaintiff says he can walk for fifteen seconds to twenty minutes, but once his burning pain starts, he cannot walk anymore. (Admin. R. at 237.) Plaintiff claims he can stand in his feet in one spot for roughly five to ten minutes, and that he could walk one or two blocks without having to stop or rest, though he may have to sit down within two blocks. (Admin. R. at 64-66.) When he is sitting down, Plaintiff estimates he can lift approximately fifty pounds. (Admin. R. at 67.) Plaintiff also claims his symptoms or conditions affect his ability to concentrate. (Admin. R. at 69.)

Plaintiff tries to keep his feet up and not walk on them to avoid swelling. (Admin. R. at 64.) He elevates his legs approximately eight times a day for twenty- or twenty-five minutes each time. (Admin. R. at 66.) In an eight-hour day of sitting the whole time, Plaintiff estimates he would need to elevate his legs 20–30% of the time. (Admin. R. at 67.) Because of the need to elevate his legs, he estimates he would need to take breaks four or more times a day throughout a work shift. (Admin. R. at 71.) He says the number of breaks needed depend on the pain and whether a headache resulted from that pain. (Admin. R. at 71.) Without a headache, his breaks would be about twenty-to-thirty minutes, but with a headache, he estimates he would need to break

Page 4 – OPINION AND ORDER

for the rest of the day.   (Admin. R. at 71.)   Given the headaches and foot problems, Plaintiff does

thinks he could not work five days a week, but he estimates he probably could work twice a week

based on the frequency of the migraines.   (Admin. R. at 71.)

Plaintiff lives alone in a house and has a dog.   (Admin. R. at 232-33.)   He feeds the dog

and gives it water and lets it outside to use the bathroom.   (Admin. R. at 233.)   At home, Plaintiff

watches television and sleeps a lot, and tries "to not think about [his] depression and pain."

(Admin. R. at 233.)   Plaintiff reports he watches television all day.   (Admin. R. at 236.)   He talks

on the phone three times a day.   (Admin. R. at 236.)   His pain keeps him up at night.   (Admin.

R. at 233.)   Plaintiff can cook, do laundry, and do "very little cleaning."   (Admin. R. at 235.)

II.    <u>Medical Evidence</u>

On September 24, 2009, Plaintiff saw Harry Walters, M.D. ("Dr. Walters.").   (Admin. R.

at 391.)   Plaintiff stated he had gout, and that his left foot was reddened and warm to the touch

and was very painful.   (Admin. R. at 393.)   Plaintiff complained of "a two-week history of rather

profound pain in his left foot MP joint."   (Admin. R. at 391.)   Plaintiff reported he had a four-to-

five-year history of gout, but he had never had a blood test.   (Admin. R. at 391.)   Plaintiff said

he "happens to have about 4–5 attacks per year."   (Admin. R. at 391.)   The exam notes indicated

moderate swelling and erythema involving the first MP joint of the left foot, and moderate swelling

about tenderness of the MP joint of the right foot.   (Admin. R. at 392.)

On November 24, 2009, Plaintiff saw Curtis Hanst, M.D. ("Dr. Hanst") and complained of

"bad gout."   (Admin. R. at 387.)   Plaintiff was new to the VA system and was visiting to establish

care and get help with chronic gout.   (Admin. R. at 387.)   Exam notes documented Plaintiff's

complaints that it "flares of pain about monthly," and that he had "gone extended periods without

RX in past that have left with him deformity at 1st MTP on both feet." (Admin. R. at 387.) For medication, Plaintiff had used Indocin in the past, but experienced only minimal benefits compared to the GI stress associated with taking it; he took prednisone that proved very effective and took Vicodin sparingly during flare-ups only. (Admin. R. at 387.)

At an annual visit on February 7, 2014, Plaintiff reported his big toes were moving into the second toes due to gout and him causing pain. (Admin. R. at 322.) Plaintiff wanted his bunions looked at. (Admin. R. at 322.) Notes from this visit indicate a podiatry referral for Plaintiff's bunions and that some of the pain was likely due to alcoholic neuropathy. (Admin. R. at 324.) The exam notes document that Plaintiff displayed normal gait at this visit. (Admin. R. at 324.)

On June 10, 2014, Plaintiff complained to a nurse practitioner that his blood pressure medication was making him sleepy and giving him night sweats. (Admin. R. at 313.) Plaintiff denied that his foot pain and hypertension were related to alcohol use and stated he would not quit drinking. (Admin. R. at 314.) Plaintiff reported drinking four or more times a week in the past year, drinking seven-to-nine drinks on a typical day in the past year, and having six or more drinks on one occasion in the past year daily or almost daily. (Admin. R. at 318.)

Plaintiff expressed concern about foot pain in both feet, mouth bleeds, and a burn on his right arm at his annual visit on May 7, 2015. (Admin. R. at 306.) Plaintiff's gait was normal at this date. (Admin. R. at 367.)

During a routine visit on July 10, 2015, Plaintiff stated the gabapentin had helped the constant pain, but he still had pain when standing or walking too long. (Admin. R. at 362, 442.) Plaintiff reported having an alcoholic drink monthly or less during the past year, reported having five or six drinks on a typical day when he was drinking in the past year, and had six or more

drinks on one occasion weekly in the past year.    (Admin. R. at 364-65.)

On July 11, 2015, Plaintiff saw Gregory Cole, Ph.D. ("Dr. Cole") for a psychodiagnostics exam.    (Admin. R. at 349.)    Dr. Cole reported Plaintiff received treatment for symptoms of depression, Plaintiff's last mental health treatment was in 2013 when he received one treatment session for symptoms of depression, and Plaintiff was psychiatrically hospitalized in 2011 when Plaintiff was suicidal, though he has not engaged in any suicide attempts.    (Admin. R. at 351.) Plaintiff reported he drank four times a month, four-to-six beers at a time; however, Dr. Cole noted his record in 2015 indicated Plaintiff was drinking "nine to eleven six-ounce cans of beer daily since 1985."    (Admin. R. at 351) (quotation in original) (internal quotation marks omitted).    Dr. Cole found Plaintiff's mood and eye contact were good, his posture was relaxed, and his affect was congruent with his verbalizations.    (Admin. R. at 352.)    Plaintiff's speech was intelligible and within normal limits, his attitude was overall engaged and cooperative, his thought processing and thought content were generally organized, and his insight and judgment were noted to be fair. (Admin. R. at 352.)    Plaintiff exhibited average intellectual capabilities.    (Admin. R. at 353.) With regard to tasks, Dr. Cole stated Plaintiff completed a simple multiple-step task with no errors, and that Plaintiff could recall six digits forward in a digits forward task, and four digits backwards on a backward digit task, though Dr. Cole noted some problems with attention and concentration on the latter task.    (Admin. R. at 353.)    Dr. Cole also noted mild problems with attention and concentration when Plaintiff completed a serial seven's task.    (Admin. R. at 353.)    Plaintiff exhibited average ability concerning his immediate memory capacity and delayed memory capacity.    (Admin. R. at 353.)    Plaintiff indicated he brushed his teeth and showered daily, completed household responsibilities once a week, did his laundry twice a month, and swept and

Page 7 – OPINION AND ORDER

mopped every three months.  (Admin. R. at 353.)  Plaintiff indicated he cooked daily meals,

drove a car, and a had a license.  (Admin. R. at 353.)

Dr. Cole diagnosed Plaintiff with "major depressive disorder, recurrent episode – severe;

unspecified anxiety disorder; alcohol use disorder – mild (there remains some question, from his

record, as to whether his continuing difficulties in this area are severe); and rule/out unspecified

personality disorder."  (Admin. R. at 354.)  Dr. Cole reported that results from this evaluation

indicated Plaintiff exhibited mild problems in the areas of attention and concentration, had average

immediate and delayed memory capabilities, was able to sustain simple routine tasks, and had no

problems completing a simple multiple-step task.  (Admin. R. at 354.)  Dr. Cole presumed that

if Plaintiff pursued a vocational placement in the near future, his claimed problems with pain would

be the primary factors impacting his overall level of vocational success.  (Admin. R. at 354.)

On July 13, 2015, Dr. Michael Henderson, D.O. ("Dr. Henderson") examined Plaintiff.

(Admin. R. at 341.)  Dr. Henderson completed a comprehensive musculoskeletal exam for

arthritis, foot deformity, cirrhosis and neuropathy.  (Admin. R. at 341.)  Dr. Henderson noted in

Plaintiff's subjective functional limitations that standing is limited to ten minutes and walking is

limited to ten-to-fifteen minutes, he is independent with activities of daily living ("ADL") and

instrumental ADL but had limitations of instrumental ADLs due to the limited walking and

standing, and is able to go shopping for about one hour at a time.  (Admin. R. at 342.)  Dr.

Henderson did not report any signs of alcohol or drug use.  (Admin. R. at 342.)  For social

history, Plaintiff stated he has four-to-six drinks per week.  (Admin. R. at 342.)  Regarding

Plaintiff's gait, Dr. Henderson commented he gets up out of his chair easily and has a mild bilateral

antalgic gait and was somewhat flat-footed.  (Admin. R. at 342.)  Dr. Henderson wrote Plaintiff

was able to bear weight briefly on the heels but complained of pain going along the ball of the

right foot and along the lateral arch.  (Admin. R. at 342.)  Dr. Henderson further commented

Plaintiff refused to walk on toes secondary to fear of pain in the first toes, and Plaintiff was able

to tandem walk and squat fully down, and that his station was erect and symmetric.  (Admin. R.

at 342.)  Dr. Henderson also noted that there was no swelling, erythema, signs of infection, or

trauma in Plaintiff's ankles and feet, and the skin is intact.  (Admin. R. at 342.)  Dr. Henderson

reported moderate to severe bilateral bunions, and the right toe is somewhat under the right second

toe.  (Admin. R. at 342.)  Dr. Henderson's assessment reads as follows:

> Foot pain:   He complains of having neuropathy, gout and bunions (foot deformity).
> On exam there is tenderness in the first metatarsal heads bilaterally which would
> be consistent with turf toe.  Overall the findings are mild.  He did not have any
> neuropathy today.   At this point there is not enough information or a reasonable
> diagnosis that would limit him from walking on ladders as much as necessary.
> Therefore no recommendations can be made to limit standing, walking or climbing
> ladders.  Vision, hearing and fine motor activity are intact.
>
> Cirrhosis:   According to his history this is not impairing to him.   He has cut down
> his drinking, but is still consuming alcohol.
>
> Arthritis:   The history is not clear as to the exact diagnosis.   Exam of the ankles,
> elbows and hands etc. did not show any significant signs of arthritis that would
> impair him from working.   His history of gout does not consistent medically.

(Admin. R. at 343.)

On October 13, 2015, Plaintiff complained to a nurse practitioner of a migraine the night

before due to foot pain from walking too much earlier that day.  (Admin. R. at 358.)  Plaintiff

had reduced his drinking to a six-pack of beer a week at the time of this visit.  (Admin. R. at 358.)

The progress notes reflect Plaintiff was praised for his reduction in alcohol use.  (Admin. R. at

360.)  Plaintiff stated he did not notice improvement in foot pain when his dose of gabapentin was

1200 mg, so the plan in the progress notes of this visit reflects a reduction to 900 mg.   (Admin.

Page 9  – OPINION AND ORDER

R. at 359.)  For Plaintiff's migraines, the plan further reflects Plaintiff was "advised NSAID preferred for prophylaxis, and too much of any OTC medication is dangerous.  Will order IBU to have on hand."  (Admin. R. at 359.)

Plaintiff saw Christine Meis, D.P.M. ("Dr. Meis") for a podiatry consult on December 7, 2015.  (Admin. R. at 542.)  Plaintiff complained of bunion pain, intermittent swelling, and localized sensitivity to the bunion area.  (Admin. R. at 542.)  Plaintiff's deformities seemed to be worsening.  (Admin. R. at 542.)  Plaintiff also complained of having burning pain to the soles of his feet that seemed to be worse during the day.  (Admin. R. at 542.)  Dr. Meis noted Plaintiff's history of alcoholic neuropathy and Plaintiff's gabapentin use.  (Admin. R. at 542.)  Dr. Meis reported:

> Inspection:  Prominent medial bunion b/l with hallux under riding the 2nd toe. More pronounced on the right foot.  No pain or limitation to ROM 1st MPJ. Hypermobile 1st ray, b/l.  5/5 strength to all 4 ankle quadrants b/l.
>
> Stance:  Flattening of both arches with moderated midtarsal pronation.
>
> Neuro:  Diminished sensation to the plantar soles with 10 gm monofilament.

(Admin. R. at 544.)  Additionally, "AP, oblique and lateral views of the left foot" revealed:

> Soft tissues are normal; there is no focal soft tissue swelling.  Bone morphology is normal.  No fracture, dislocation or subluxation is seen.  The first metatarsal phalangeal angle measures 33.8 degrees (normal less than 15 degrees).  A moderate bunion is present.  The 1–2 intermetatarsal angle is 12 degrees (normal less than 9 degrees).  There is no evidence for pen planus.  Articular surfaces are normal at all levels.  Lis franc's joint is normal.

(Admin. R. at 544.)  Further, "AP, weight bearing lateral views of the right foot" revealed:

> Soft tissues are normal; there is no focal soft tissue swelling.  Bone morphology is normal.  No fracture, dislocation or subluxation is seen.  The first metatarsal phalangeal angle measures 35.2 degrees (normal less than 15 degrees).  A prominent bunion is noted.  The 1–2 intermetatarsal angle measures 11.9 degrees (normal less than 9 degrees).  Articular surfaces are normal at all levels.  Lis

franc's joint is normal.   No evidence for pes planus is seen.

(Admin. R. at 544-45.)   Plaintiff and Dr. Meis discussed conservative versus surgical treatment options, and "[d]ue to neuropathy and bunion," Dr. Meis "recommended he try ortho shoes and orthotics first."   (Admin. R. at 545.)   Dr. Meis requested a fitting consult for orthopedic shoes for Plaintiff based on Plaintiff's foot deformities, specifically "Bunion; edema."   (Admin. R. at 557.)

State agency non-examining medical consultants reviewed the available medical evidence from July and November 2015.   (Admin. R. at 89-134.)   On initial review, a consultant found Plaintiff could occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds, stand or walk with normal breaks for six hours in an eight-hour work day, sit with normal breaks for six hours in an eight-hour work day, and climb ramps, stairs, ladders, ropes, or scaffolds frequently (Admin. R. at 89-90, 102-103.)

On January 6, 2016, Plaintiff visited Mark Turner, Certified Orthotist ("Turner"), in the Orthotic Clinic for "eval Depth inlay shoes and bilam insoles."   (Admin. R. at 539.)   Turner issued Plaintiff "Shoes G8010M 11XW."   (Admin. R. at 540.)

On May 2, 2016, Plaintiff had an annual health screen.   (Admin. R. at 530.)   Regarding amputation risk, Plaintiff underwent a sensory foot exam, pedal pulse exam, and visual foot exam at this visit.   (Admin. R. at 533.)   Plaintiff's "POD risk score" was at "level '0' (normal risk), normal sensation and circulation, no deformity, and no ulceration or history of amputation." (Admin. R. at 534.)   Notes from this visit reflect Plaintiff's feet felt better with orthotics but Plaintiff still had pain.   (Admin. R. at 536.)   Treatment notes reflect a discussion of conservative versus surgical treatment options and a recommendation that due to "neuropathy and bunion" Plaintiff "try ortho shoe and orthotics first."   (Admin. R. at 536.)   Plaintiff stated he had markedly

Page 11  – OPINION AND ORDER

reduced alcohol use.   (Admin. R. at 536.)   Plaintiff's gait was normal at this visit.   (Admin. R. at 538.)

Plaintiff saw Turner again on December 1, 2016, when Turner evaluated Plaintiff for replacement therapeutic shoes.   (Admin. R. at 522.)   Turner issued Plaintiff Apex shoes G8010M 11XW.   (Admin. R. at 522.)

On April 17, 2017, at an annual visit, Plaintiff saw a nurse and Ahsan Khan, M.D. ("Dr. Khan"), Plaintiff's treating physician.   Plaintiff told a nurse he wanted to discuss pain in both feet. (Admin. R. at 509.)   Plaintiff reported having a drink containing alcohol two-to-three times per week in the past year, having five-to-six drinks on a typical day when he was drinking in the past year, and having six or more drinks on one occasion weekly in the past year.   (Admin. R. at 511.) Dr. Khan noted "MS/RHEUM no articular or joint PAIN or SWELLING" and "Ext no c/c or pedal edema."   (Admin. R. at 518-19.)

Plaintiff again saw Dr. Khan in July 2017.   (Admin. R. at 574.)   Plaintiff had recently fallen backward and and suffered a spiral displaced fracture on the third finger of his left hand. (Admin. R. at 575.)   Regarding Plaintiff's foot condition, Dr. Khan noted:

> Right foot:   B/L bunion/ hallux valgus deformities and neuropathy seen by podiatry earlier; Rec was conservative vs surgical tx options.
>
> Increasing in pain.   Veteran is contemplating proceeding with recommendation.
>
> Orthotics helping.
>
> Podiatry consult.

(Admin. R. at 576.)   Dr. Khan requested a podiatry consult for Plaintiff.   (Admin. R. at 558). Dr. Khan listed the provisional diagnosis as "Foot pain; Hallux [valgus] deformities."   (Admin. R. at 558.)

Page 12 – OPINION AND ORDER

On August 24, 2017, Plaintiff visited Dr. Meis for a podiatry consult.   (Admin. R. at 559.)
Plaintiff presented to the clinic for an ongoing complaint of bilateral bunion and reported
intermittent swelling.   (Admin. R. at 559.)   Plaintiff also expressed he would like to get another
pair of shoes.   (Admin. R. at 559.)   Plaintiff was "on the max of Gabapentin" and stated "it keeps
it somewhat tolerable."   (Admin. R. at 559) (internal quotation marks omitted).   Dr. Meis's notes
of Plaintiff's chief complaint read: "multiple right foot issues.   Hallux deformity, bunion, and
neuropathy.   Was offered possible corrective operative repair by podiatry.   He is reconsidering.
But his pain has increased to much higher intensity than before thus needing podiatry referral."
(Admin. R. at 559-60.)   Notes from Dr. Meis's exam read as follows:

> Inspection:   Prominent medial bunion b/l with hallux under riding the 2nd toe.
> More pronounced on the right foot.   No pain or limitation to ROM 1st MPJ.
> Hypermobile 1st ray, b/l.   5/5 strength to all 4 ankle quadrants b/l.
>
> Stance:   Flattening of both arches with moderated midtarsal pronation and +
> haviculoar drop sign.
>
> Neuro:   Diminished sensation to the plantar soles with 10 gm monofilament.
>
> Current shoes:   Apex ambulator, Velcro- no custom orthotic- very worn and torn
> at upper last.
>
> IMP:    B/L bunion/ hallux valgus deformities
>           Alcoholic neuropathy
>
> PLAN:   He will need a custom accommodative orthotic and a much more durable
> custom fit shoe to accommodate bunion deformities.   Will send him to prosthetic
> vendor in KF.

(Admin. R. at 561.)

Dr. Khan provided his opinion on September 26, 2017.   (Admin. R. at 591.)   Dr. Khan
noted the frequency and length of contact between himself and Plaintiff as "locum provider (few
months)."   (Admin. R. at 591.)   Plaintiff's diagnoses were "bilateral bunion/hallux valgus

Page 13  – OPINION AND ORDER

deformit[y]" and "neuropathy." (Admin. R. at 591.) For Plaintiff's prognosis, Dr. Khan wrote "deformities – life long – limits daily activit[y]." (Admin. R. at 591.) Dr. Khan listed Plaintiff's symptoms as "after twenty minutes of standing he has high intensity pain, swelling, cramps." (Admin. R. at 591.) Dr. Khan characterized the nature, location, frequency, precipitating factors, and severity of Plaintiff's pain as "sharp and stabbing, bilateral feet, daily, prolonged standing/bearing weights, limits his ambulation." (Admin. R. at 591.) Dr. Khan described Plaintiff's treatment and response including any side-effects of medication that may have implications for working as "custom accommodating orthotic, pain analgesic including narcotic for severe pain, narcotics drowsiness/constipation." (Admin. R. at 591.) Dr. Khan wrote Plaintiff could walk a few blocks or ten minutes without rest or severe pain, could sit for more than two hours, could stand for fifteen minutes, and could stand/walk for fifteen to twenty minutes. (Admin. R. at 592.) Dr. Khan noted Plaintiff would sometimes need to take unscheduled breaks during a working day and could "walk not more than 15–20 minutes," and indicated how often that would occur was "variable (as related to foot pain)" and that Plaintiff would need to rest "until pain relief" before returning to work. (Admin. R. at 592.) Dr. Khan further noted with prolonged sitting Plaintiff's legs should be elevated 25% of an eight-hour workday. (Admin. R. at 593.) Dr. Khan opined Plaintiff could climb stairs and ladders occasionally and twist, stoop (bend), and crouch/squat frequently, and noted "key is duration of bearing weight on his feet." (Admin. R. at 593.) Dr. Khan noted Plaintiff was likely to be "off task" because of symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks 25% or more of a typical workday. (Admin. R. at 594.) Dr. Khan estimated Plaintiff would be absent from work if trying to work full time more than four days per month as a result of the impairments or

Page 14 – OPINION AND ORDER

treatment.   (Admin. R. at 594.)

III.    <u>Vocational Evidence</u>

Frank Lucas ("Lucas") participated in the hearing and testified as a vocational expert. (Admin. R. at 73.)   Lucas summarized Plaintiff's vocational background as one job, an electrician, which is medium-level work.   (Admin. R. at 67.)   The ALJ asked Lucas if an individual with the same age, education and past work as Plaintiff, limited to medium exertional work with additional limitations of no more than frequent climbing, and no more than occasional contact with the general public, would be able to perform the work as an electrician.   (Admin. R. at 74.)   Lucas testified such an individual would be able to perform Plaintiff's past relevant work.   (Admin. R. at 74.)   The ALJ asked for examples of other work that person could perform, and Lucas testified an individual with such limitations could work as an industrial cleaner, linen room attendant, and hand packager, all of which he classified as medium-level work.   (Admin. R. at 74.)

Lucas then testified there is a job titled "electrician," but it is an electrician in a manufactured building, which would require wiring trailer houses or mobile homes, and which is classified as light work, with a rough estimate of 100,000 of those jobs in the economy.   (Admin. R. at 75.)   The ALJ asked Lucas what skills Plaintiff would have acquired in his past work as an electrician that would transfer to the electrician job Lucas identified, and Lucas responded electrical skills such as wiring, installing, working with fuse boxes, and pulling the wires are skills that could be transferred.   (Admin. R. at 75.)   Lucas added the difference between the new electrician job he identified and Plaintiff's past work as an electrician is the new job involves interior installation in an enclosed, smaller space that would not require digging, erecting poles, climbing under houses, and all the heavy labor that is required for the construction electrician job.

Page 15 – OPINION AND ORDER

(Admin. R. at 75.)  In response to a question posed by Plaintiff's counsel, Lucas testified the mobile home electrician job would require eight hours on a person's feet, lifting twenty pounds occasionally and lifting ten pounds frequently, and that the job would be considered light, but not sedentary work.  (Admin. R. at 76.)

Plaintiff's counsel asked Lucas if someone limited to lifting from a seated position or chair could do this job, and Lucas said they could not.  (Admin. R. at 77.)  Plaintiff's counsel next asked Lucas if, given that lifting restriction, "would there be any transferable skills to sedentary or light that this person had," and Lucas responded there were not.  (Admin. R. at 77.)  In response to Plaintiff's counsel, Lucas further testified if someone had to have their legs elevated for 25% of the time, no jobs exist for anything transferable to light or sedentary.  Plaintiff's counsel asked Lucas if the hypothetical were changed to only occasional climbing or occasional stairs versus frequent, would Plaintiff be able to do his past work, and Lucas responded that an electrician requires occasional climbing, so Plaintiff would be able to do his past work.  (Admin. R. at 77-78.)

Lucas then opined that if someone were to be absent two days a week, that would not be tolerated for competitive employment.  (Admin. R. at 78.)  Plaintiff's counsel then asked Lucas "if someone were to be off task with attention and concentration for 25% or more, would they – would that be tolerated for competitive employment?"  (Admin. R. at 78.)  Lucas responded, "[a]gain in my opinion, no."  (Admin. R. at 78.)  Lucas further opined in response to Plaintiff's counsel that if someone needed to take four extra breaks for fifteen-to-twenty minutes each during a shift, which also would not be tolerated for competitive employment.  (Admin. R. at 78.)

IV.    ALJ Decision

In her decision issued January 9, 2018, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 2013, the alleged onset date, but concluded Plaintiff had not been suffering from a disability within the meaning of the Act since January 1, 2013. (Admin. R. at 15-16.)

The ALJ found Plaintiff has the following medically determinable severe impairments that significantly limit the ability to perform basic work activities: bilateral bunion/hallux valgus deformities; alcoholic neuropathy; arthritis; major depressive disorder; unspecified anxiety disorder; and alcohol use disorder. (Admin. R. at 16.) However, the ALJ determined Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listings. (Admin. R. at 17.)

The ALJ then found Plaintiff has the residual functional capacity to perform medium work, except he is limited to frequent climbing and occasional contact with the general public. (Admin. R. at 18.) The ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's alleged symptoms; however, the ALJ found Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Admin. R. at 19.) The ALJ found Plaintiff's statements inconsistent for the following reasons: "the observations on examinations by multiple sources fail to document objective findings suggestive of significant functional deficits"; "[t]he claimant worked for many years with the deformities"; "[w]here noted, the claimant had a normal to mildly antalgic gait"; "[a]lcohol was suspected to be a contributing factor for his neuropathic foot pain complaints"; "[d]espite testifying at hearing that he has

drowsiness from medications, he did not report this to treating sources"; and "[h]e did report that gabapentin was helpful for constant pain as were orthotics."  (Admin. R. at 20.)

Further, the ALJ gave Dr. Khan's assessment little weight because the reported symptoms were not consistent with the physician's treatment record and Plaintiff, and because Dr. Khan had a limited-duration treating relationship.  (Admin. R. at 21.)  The ALJ gave Dr. Henderson's conclusion that he had no basis for limiting Plaintiff's work activities little weight and found that "there are sufficient treatment records with some ongoing complaints to support a need for some restrictions."  (Admin. R. at 20.)  The ALJ gave great weight to the initial determination and little weight to the reconsideration determination of state agency non-examining medical consultants who reviewed the available medical evidence from July and November 2015.  (Admin. R. at 21.)  The ALJ gave great weight to Dr. Cole's opinion, who saw Plaintiff for a psychological evaluation in July 2015, and thus found it appropriate to limit interactions with the public due to Plaintiff's anxiety around others and the potential for difficulty sustaining appropriate interactions due to depressive symptoms; the ALJ noted this finding also accounts for any compounding of the effects of symptoms due to alcohol use.  (Admin. R. at 22.)  The ALJ also gave great weight to the state agency non-examining psychological consultants who reviewed the available medical evidence in July and November 2015.  (Admin. R. at 22.)

The ALJ found Plaintiff is capable of performing past relevant work as an electrician, and that this work as an electrician does not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.  (Admin. R. at 22.)  The ALJ also noted there are other jobs in the national economy Plaintiff is also able to perform, such as an electrician in manufactured buildings, industrial cleaner, linen room attendant, and hand packager.  (Admin.

R. at 22-24.)   Accordingly, the ALJ found Plaintiff has not been under a disability as defined in

the Act from January 1, 2013, through the date of the ALJ's decision.   (Admin. R. at 24.)

*Standard of Review*

The Act provides for payment of DIB to people who have contributed to the Social Security

program and who suffer from a physical or mental disability.   42 U.S.C. § 423(a)(1).   In addition,

under the Act, SSI may be available to individuals who are age sixty-five or over, or blind, or

disabled, but who do not have insured status under the Act.   42 U.S.C. § 1382(a).   The burden of

proof to establish a disability rests upon the claimant.   *Gomez v. Chater*, 74 F.3d 967, 970 (9th

Cir.), *cert. denied*, 519 U.S. 881 (1996) (DIB); *Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir.

1992) (SSI).   To meet this burden, the claimant must demonstrate an inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to cause death or to last for a continuous period of at least twelve months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   An individual will be determined to be disabled only

if there are physical or mental impairments of such severity that the individual is not only unable

to do previous work but cannot, considering his or her age, education, and work experience, engage

in any other kind of substantial gainful work which exists in the national economy.   42 U.S.C. §§

423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process to use for

determining whether a person is eligible for either DIB or SSI because he or she is disabled.   20

C.F.R. §§ 404.1520, 416.920 (2019); *Lester v. Chater*, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (DIB);

*Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989) (SSI).   First, the Commissioner

determines whether the claimant is engaged in "substantial gainful activity."   If the claimant is

Page 19 – OPINION AND ORDER

engaged in such activity, Benefits are denied.    Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.    A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities."    20 C.F.R. §§ 404.1520(c), 416.920(c).    If the claimant does not have a severe impairment or combination of impairments, Benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of the specifically listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.    20 C.F.R. §§ 404.1520(d), 416.920(d).    If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.    If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant has performed in the past.    If the claimant can perform work which he or she has performed in the past, a finding of "not disabled" is made and Benefits are denied.    20 C.F.R. §§ 404.1520(e), 416.920(e).

If the claimant is unable to do work performed in the past, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy considering his or her age, education, and work experience.    The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. _Distasio v. Shalala_, 47 F.3d 348, 349 (9th Cir. 1995) (DIB); _Drouin_, 966 F.2d at 1257 (SSI).    The claimant is entitled to Benefits only if he or she is not able to perform other work.    20 C.F.R. §§ 404.1520(f), 416.920(f).

When an individual seeks either DIB or SSI because of disability, judicial review of the Commissioner's decision is guided by the same standards.    42 U.S.C. §§ 405(g), 1383(c)(3).    The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.    42 U.S.C. § 405(g); _Batson v. Comm'r of the Soc. Sec. Admin._, 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." _Robbins v. Soc. Sec. Admin._, 466 F.3d 880, 882 (9th Cir. 2006).    It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."    _Tylitzki v. Shalala_, 999 F.2d 1411, 1413 (9th Cir. 1993).

The reviewing court may not substitute its judgment for that of the Commissioner. _Robbins_, 466 F.3d at 882; _Edlund v. Massanari_, 253 F.3d 1152, 1156 (9th Cir. 2001).    Thus, where the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld, even where the evidence can support either affirming or reversing the ALJ's conclusion.    _Burch v. Barnhart_, 400 F.3d 676, 679 (9th Cir. 2005).    The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. _Andrews v. Shalala_, 53 F.3d 1035, 1039 (9th Cir. 1995).    In determining a claimant's residual functioning capacity, an ALJ must consider all relevant evidence in the record, including, inter alia, medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment."    _Robbins_, 466 F.3d at 883 (citing SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996); 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); _Smolen v. Chater_, 80 F.3d 1273, 1281 (9th Cir. 1996)).    However, the reviewing court must consider the entire record as a whole, weighing both the evidence that supports and detracts from

Page 21 – OPINION AND ORDER

the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007).

*Discussion*

Plaintiff asserts the ALJ erred by improperly rejecting Plaintiff's allegations and improperly rejecting the medical source opinion from Plaintiff's treatment provider, Dr. Khan. (Pl.'s Br. at 8, ECF No. 15.)   Plaintiff argues the ALJ's improper rejection of Plaintiff's testimony and Dr. Khan's opinion was not harmless error, (Pl.'s Br. at 13, 17), and asks this court to credit the improperly rejected testimony as true and remand this action to the Commissioner for an award of Benefits, or in the alternative, remand to allow the ALJ to fully consider the evidence and correct the stated errors, (Pl.'s Br. at 17.)   The Commissioner contends the ALJ's interpretation of the evidence is reasonable and supported by substantial evidence and therefore this court should affirm her decision.   (Def.'s Br. at 2, ECF No. 16.)

I.     Plaintiff's Testimony

To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must perform two stages of analysis.   *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017).   The first stage is a threshold test in which the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged.   *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012); *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008).   At the second stage, absent affirmative evidence the claimant is malingering, the ALJ must provide clear and convincing reasons for discrediting the claimant's testimony regarding the severity of the symptoms.   *Lingenfelter*, 504 F.3d at 1036.

The ALJ must make sufficiently specific findings to permit the reviewing court to conclude the ALJ did not arbitrarily discredit the claimant's testimony.  *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015).  "The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion."  *Smolen*, 80 F.3d at 1284.  Factors the ALJ may consider when making such credibility determinations include the objective medical evidence, the claimant's treatment history, the claimant's daily activities, and inconsistencies in testimony.  *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014); *Tommasetti*, 533 F.3d at 1039.  "[T]he Commissioner may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence."  *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).  The overall credibility decision may be upheld even if not all of the ALJ's reasons for rejecting a claimant's testimony are upheld.  *Batson*, 359 F.3d at 1197.

Here, the ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the ALJ found Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (Admin. R. at 19.)  Consequently, the ALJ was required to offer clear and convincing reasons for rejecting Plaintiff's testimony regarding his limitations.  To meet this standard, "[t]he ALJ must specify what testimony is not credible and identify the evidence that undermines that claimant's complaints – '[g]eneral findings are insufficient.'"  *Burch*, 400 F.3d at 680 (quoting *Reddick*, 157 F.3d at 722); *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991) *(en banc)* ("[A] reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain.")

Page 23 – OPINION AND ORDER

The ALJ in this case gave the following reasons for discrediting Plaintiff's symptom allegations:   (1) the observations on examinations by multiple sources fail to document objective findings suggestive of significant functional deficits; (2) Plaintiff worked for many years with the deformities; (3) where noted, Plaintiff had a normal to mildly antalgic gait; (4) alcohol was suspected to be a contributing factor for his neuropathic foot pain complaints; (5) he did not report drowsiness as a medication side effect to treating sources, despite testifying at hearing that he has drowsiness from medications; and (6) he did report that gabapentin was helpful for constant pain as were orthotics.   (Admin. R. at 20.)   These reasons were not clear and convincing.

### A.  Inconsistency with Objective Medical Record

The ALJ found Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms inconsistent with the medical evidence and other evidence in the record because "the observations on examinations by multiple sources fail to document objective findings suggestive of significant functional deficits."   (Admin. R. at 19-20.)   The Commissioner asserts the ALJ supported her statement with evidence in the record that establishes Plaintiff had a normal to mildly antalgic gait, and Plaintiff endorsed only mild to moderate mental health symptoms. (Def.'s Br. at 6-7; *see also* Admin. R. at 20-21.)   Plaintiff argues his allegations were consistent with the medical evidence and other evidence in the record, supported by Dr. Meis, Dr. Khan, and Dr. Redd's diagnoses of hallux valgus deformities with bilateral bunion.   (Pl.'s Br. at 10-11). Plaintiff further argues his normal gait is not a clear and convincing reason to reject Plaintiff's testimony because the ALJ ignored Plaintiff's inability to maintain a normal gait after fifteen or twenty minutes on his feet.   (Pl.'s Br. at 12.)

The ALJ's finding that Plaintiff's "statements about the intensity, persistence, and limiting effects of his symptoms [is] inconsistent because the observations on examinations by multiple sources fail to document objective findings suggestive of significant functional deficits" is not a clear and convincing reason to reject Plaintiff's testimony. (Admin. R. at 19-20.)   The Ninth Circuit has expressly held a boilerplate statement such as this, without more, "falls short of meeting the ALJ's responsibility to provide 'a discussion of the evidence' and 'the reason or reasons upon which' his adverse determination is based." _Treichler v. SSA_, 775 F.3d 1090, 1103 (9th Cir. 2014) (quoting 42 U.S.C. § 405(b)(1)); _Brown-Hunter_, 806 F.3d at 493 (finding ALJ's conclusory statement that limitations identified by claimant were less serious than alleged based on unspecified claimant testimony and a summary of medical evidence insufficient to meet clear and convincing standard).   In evaluating a claimant's statements, an ALJ must "determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain and other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings . . . ."   20 C.F.R. §§ 404.1529(a), 416.929(a).

Here, the ALJ failed to adequately discuss the evidence and identify with any particularity the portions of Plaintiff's testimony she found less than credible.   Furthermore, the ALJ merely summarized the medical evidence – "examinations by multiple sources" – without identifying the medical evidence she believed undermined Plaintiff's testimony. (Admin. R. at 20.)   The ALJ did state that Plaintiff had a normal to mildly antalgic gait and relied on various points in the record where Plaintiff's gait is noted. (Admin. R. at 20.)   However, the ALJ did not specify what portion of Plaintiff's testimony is inconsistent with those parts of the record.   "The ALJ must specifically identify the testimony she or he finds not to be credible and must explain what

evidence undermines the testimony." _Holohan v. Massanari_, 246 F.3d 1195, 1208 (9th Cir. 2001). The ALJ failed to do so here, because the ALJ did not specifically identify the testimony she found incredible as inconsistent with the evidence of Plaintiff's normal to mildly antalgic gait. Therefore, this is not a clear and convincing reason for ALJ to reject Plaintiff's testimony.

### B. Plaintiff Worked with Deformities

The ALJ discredited Plaintiff's testimony in part because he "worked for many years with the deformities." (Admin. R. at 20.) The ALJ supported her conclusion by citing to a physician note from November 21, 2009, when Plaintiff complained of "bad gout." (Admin. R. at 20, 387.) The treatment note the ALJ relied upon reads: "44 YO NEW PT TO VA SYSTEM HERE TO ESTABLISH CARE AND GET HELP WITH CHRONIC GOUT. HAS FLARES OF PAIN ABOUT MONTHLY BUT HAS GONE EXTENDED PERIOS WITHOUT RX IN PAST THAT HAVE LEFT HIM WITH DEFORMITY AT 1ST MTP ON BOTH FEET." (Admin. R. at 387.)

Plaintiff argues he did not work for many years with the deformities; rather, he worked with gout, but was unable to work after his chronic gout worsened to hallux valgus deformity, with which he was not diagnosed until 2015. (Pl.s Br. at 11.) The Commissioner argues the treatment note relied on by the ALJ shows Plaintiff had foot deformities in November 2009. (Def.'s Br. at 5.)

When making an adverse credibility finding, an ALJ may rely on evidence that a claimant worked for a number of years with a long-standing impairment that has not changed. _Gregory v. Bowen_, 844 F.2d 664, 666-67 (9th Cir. 1988); _see also Tylitzki_, 999 F.2d at 1414, _Ray v. Bowen_, 813 F.2d 914, 917 (9th Cir. 1987). There is no presumption that long-standing impairments that have not previously precluded work are not disabling unless there is evidence of deterioration.

Page 26 – OPINION AND ORDER

*Tylitzki*, 999 F.2d at 1414 (rejecting such a presumption and noting in *Gregory v. Bowen*, 844 F.2d 664 (9th Cir. 1988) and *Ray v. Bowen*, 813 F.2d 914 (9th Cir. 1987), "long-standing conditions that were not previously disabling were found not presently disabling specifically because the conditions had not changed," and distinguishing those cases from the plaintiff in *Tylitzki* because the plaintiff's "condition had deteriorated from the days when we was able to hold the same job for nearly twenty-seven years.").

That Plaintiff previously was able to work notwithstanding his deformities is not a valid clear and convincing reason for the ALJ to reject his credibility.   The record contains evidence that Plaintiff's condition has deteriorated in the time since he worked with that condition.   Plaintiff claims he stopped working on September 1, 2012, because of his condition.   (Admin. R. at 61, 222, 224.)   He reported his conditions caused him to make changes in his work activity as of January 1, 2009.   (Admin. R. at 222.)   Plaintiff testified his condition had grown worse over time as continued to work.   (Admin. R. at 61.)   He first reported his deformities on November 24, 2009.   (Admin. R. at 387.)   On February 7, 2014, he raised concerns at his annual visit about his "big toes moving into 2nd toes due to gout and causing pain."   (Admin. R. at 322.)   Dr. Meis reported on December 7, 2015, that Plaintiff's "[d]eformities seem to be worsening."   (Admin. R. at 542.)   On August 24, 2017, Dr. Meis reported "his pain has increased to much higher intensity than before thus needing podiatry referral."   (Admin. R. at 560.)   Given the evidence in the record that Plaintiff's condition deteriorated, evidence that he had been able to work even with his impairments is not a clear and convincing reason to reject Plaintiff's testimony.

C.  *Alcohol as Contributing Factor to Neuropathic Foot Pain*

The ALJ discredited Plaintiff's testimony in part because "[a]lcohol was suspected to be a contributing factor for his neuropathic foot pain complaints." (Admin. R. at 20.) Plaintiff argues alcohol as a contributing factor is not a clear and convincing reason to reject Plaintiff's testimony because Plaintiff reduced his alcohol consumption in 2015, and his neuropathy continued despite his reduction in beer consumption. (Pl.'s Br. at 12.) In his brief, the Commissioner does not discuss this reason for rejecting Plaintiff's testimony.

If there is medical evidence of alcoholism or drug abuse, the ALJ must complete a Drug Addiction and Alcoholism ("DAA") analysis to determine whether drug addiction or alcoholism is a contributing factor material to a finding that a claimant is disabled, where the key factor is whether claimant would still be found disabled if he or she stopped using drugs or alcohol. SSR 13-2p, 2013 WL 621536, at *2, 4 (Feb. 20, 2013); 20 C.F.R. §§ 404.1535, 416.935. The determination is made by evaluating "which of [claimant's] current physical and mental limitations . . . would remain if [claimant] stopped using drugs or alcohol and then determine whether any or all of [claimant's] remaining limitations would be disabling." 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2). DAA is not material to the determination that the claimant is under a disability if the claimant would still meet the definition of disability if he or she were not using drugs or alcohol. SSR 13-2p, 2013 WL 621536, at *4. That is, "[j]ust because substance abuse contributes to a disability does not mean that when the substance abuse ends, the disability will too." *Sousa v. Callahan*, 143 F.3d 1240, 1245 (9th Cir. 1998). Plaintiff must be given an opportunity to present evidence on whether their disability would have remained if they stopped using drugs and alcohol. *Sousa*, 143 F.3d at 1245. Pursuant to the DAA, the ALJ is tasked with performing a second five-step sequential evaluation, while considering whether the claimant has

Page 28 – OPINION AND ORDER

severe impairments that would persist absent substance use. *See Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir. 2001) ("We hold that an ALJ must conduct a 'differentiating' analysis to separate the alcoholism and drug-related impairments from the unrelated physical impairments only if the record indicates that the non-substance-abuse-related impairments are 'severe' and therefore pass step 2 of the sequential evaluation process."); *Sousa*, 143 F.3d at 1245.

Alcohol as a contributing factor in this case is not a clear and convincing reason to reject Plaintiff's testimony because the ALJ erred in failing to conduct a valid DAA analysis. The ALJ found Plaintiff had the following severe impairments: "bilateral bunion/hallux valgus deformities; alcoholic neuropathy; arthritis; major depressive disorder; unspecified anxiety disorder; and alcohol use disorder." (Admin. R. at 16.) However, the ALJ did not conduct a DAA or "differentiating" analysis. Rather, the ALJ merely stated "[a]lcohol was suspected to be a contributing factor for his neuropathic foot pain complaints" (Admin. R. at 20), and therefore did not give Plaintiff an opportunity to present evidence on whether his neuropathy would have remained if he stopped using alcohol.

Moreover, evidence in the record suggests Plaintiff's impairment would not improve to the point of nondisability without a valid DAA analysis. *See* SSR 13-2p, 2013 WL 621536, at *7. Progress notes from Plaintiff's VA clinic visit on October 13, 2015, reflect Plaintiff was praised for his reduction in alcohol use, and discussed "all disease states that will be improved by reduction (HTN, neuropathy, migraines, gout, depression, liver)." (Admin. R. at 360, 442.) Plaintiff was still seen for neuropathy in September 2017. (Admin. R. at 615.) Because the ALJ did not engage in a valid DAA analysis, alcohol as a contributing factor is not a clear and convincing reason to discredit Plaintiff's testimony.

Page 29 – OPINION AND ORDER

*D.  Medication Side Effects Unreported*

The ALJ discredited Plaintiff's testimony, explaining that "[d]espite testifying at the hearing that he has drowsiness from medications, he did not report this to treating sources." (Admin. R. at 20.)  In support of the ALJ's decision, the Commissioner cites places in the record where Plaintiff did not report this side-effect to his treatment sources, such as on October 13, 2015 (Admin. R. at 440-42), and on May 7, 2015 (Admin. R. at 446-48).  (Def.'s Br. at 7.)  Further, the Commissioner argues Dr. Khan's treatment notes, such as those from April 17, 2017 (Admin. R. at 516-21), and July 6, 2017 (Admin. R. at 574-77), reflect that Plaintiff did not have any medication side-effects.  (Def.'s Br. at 7.)  Plaintiff testified at his hearing he experienced drowsiness as a side-effect of a medication.  (Admin. R. at 69.)  He points to his report of drowsiness as a side-effect to his primary care provider, Dr. Khan, as reflected by Dr. Khan's medical source opinion from September 26, 2017, which confirmed that Plaintiff's report that his medications caused "drowsiness/constipation."  (Pl.'s Br. at 12; Admin. R. at 591.)

The ALJ may consider unexplained or inadequately explained failure to seek treatment in assessing the credibility of a claimant's symptom testimony.  *Molina*, 674 F.3d at 1112.  Failure to seek treatment without asserting a "good reason" for not doing so can "cast doubt on the sincerity" of a claimant's testimony.  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

The ALJ erred in finding that Plaintiff failed to seek treatment for or report his medication side-effects, because the record evidence shows he did report his side-effects; thus, this is not a clear and convincing reason to reject Plaintiff's credibility.  Plaintiff reported the side-effects of his "narcotics" medication to Dr. Khan on September 26, 2017, when Dr. Khan recorded those

side effects as "drowsiness/constipation." (Admin. R. at 591.) Therefore, Plaintiff's side-effects

from his medication are not a clear and convincing reason to discredit Plaintiff's testimony.

### E. Effective Treatment

The ALJ rejected Plaintiff's testimony partly because Plaintiff reported "gabapentin was

helpful for constant pain as were orthotics." (Admin. R. at 20.) The ALJ relied upon Plaintiff's

various statements throughout the record, such as Plaintiff's statement that gabapentin had helped

the constant pain but still experienced pain when when standing or walking too long (Admin. R.

at 442); Plaintiff's statement that "gabapentin is helping with the neuropathic aspect of this" to Dr.

Khan on April 17, 2017 (Admin. R. at 517); a nurse practitioner's note reflecting that Plaintiff's

feet were "better with orthotics but still with pain" (Admin. R. at 536); and Plaintiff's report to Dr.

Meis that gabapentin "keeps it somewhat tolerable." (Admin. R. at 568.) The ALJ further

explained "[i]t did not prevent pain with activity, but the inability of a claimant to work without

some pain and discomfort does not necessarily satisfy the test for disability under the provisions

of the Act." (Admin. R. at 20.) Plaintiff contends that evidence that he found medications and

orthotics helpful does not undermine his testimony, because his stated limitations were while on

the maximum dose of gabapentin and while wearing orthotics; and despite being on the maximum

dose of gabapentin, Dr. Meis wrote Plaintiff's pain had increased to a much higher intensity than

before. (Pl.'s Br. at 12-13.)

The ALJ may rely on evidence that claimant responded favorably to conservative treatment

and find such a response to conservative treatment undermines a claimant's reports regarding the

disabling nature of his pain. _Tommasetti_, 533 F.3d at 1040. Evidence of conservative treatment

is sufficient to discount a claimant's testimony regarding severity of an impairment. _Parra v._

*Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)).   The type, dosage, effectiveness, and side-effects of any medication a claimant takes or has taken to alleviate his or her pain or other symptoms may properly be considered by the ALJ in determining the nature and severity of a claimant's symptoms and the extent to which they limit a claimant's capacity for work.   20 C.F.R. §§ 404.1529(c), 416.929(c).   Even "where a claimant introduces medical evidence showing that he has an ailment reasonably expected to produce *some* pain," it remains the case that "many medical conditions produce pain not severe enough to preclude gainful employment."   *Fair*, 885 F.2d at 603 (emphasis in original).

Plaintiff's favorable response to conservative treatment was a clear and convincing reason to find his testimony not credible.   It is clear from the record that Plaintiff responded favorably to gabapentin and orthotics.   (Admin. R. at 442, 517, 536, 568.)   The ALJ properly considered the treatment record in determining gabapentin and orthotics were helpful to Plaintiff and validly relied upon the effectiveness of such conservative treatment in rejecting the credibility of Plaintiff's testimony.

   *F.  Conclusion*

   "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."   *Andrews*, 53 F.3d at 1039.   The ALJ's findings should be upheld if supported by inferences reasonably drawn from the record; if evidence exists to support more than one rational interpretation, the court is bound to uphold that interpretation. *Batson*, 359 F.3d at 1193.   If the ALJ's finding is supported by substantial evidence in the record, the court "may not engage in second-guessing."   *Tommasetti*, 533 F.3d at 1039 (quoting *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002)).

Here, the ALJ's finding were not supported by substantial evidence in the record. The ALJ instead relied on boilerplate findings, failed to address whether Plaintiff's condition had deteriorated since he worked with that condition, failed to complete a proper DAA analysis, and ignored evidence in the treatment record that Plaintiff reported his medication side-effects to his treating physician. The only clear and convincing reason the ALJ provided for her negative credibility finding was Plaintiff's favorable response to conservative treatment. Thus, the ALJ's negative credibility finding regarding Plaintiff's testimony is not supported by substantial evidence in the record. This was not harmless error, because the intensity, persistence, and limiting effects of Plaintiff's symptoms are consequential to the non-disability determination. *See Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006).

II.    Dr. Khan's Medical Source Opinion Evidence

The ALJ gave Dr. Khan's assessment "little weight as the reported symptoms are not consistent with the physician's treatment record and they have a limited treating relationship dating to only April 2017." (Admin. R. at 21.) In giving the opinion little weight, the ALJ relied on Dr. Khan's treatment notes stating Plaintiff did not have edema, and other sources noted no swelling, and Plaintiff himself reported having only intermittent swelling, all three of which the ALJ found to contradict the need for elevation of the legs for 25% of the day. (Admin. R. at 21.) Plaintiff argues Dr. Khan's opinion was consistent with Dr. Khan's treatment notes. (Pl.'s Br. at 15.) Plaintiff further argues edema and swelling are not the same thing, and Dr. Khan's observation in his treatment notes that Plaintiff did not have edema is unrelated to Dr. Khan's opinion that prolonged standing caused Plaintiff's feet to swell. (Pl.'s Br. at 15.)

The weight attributable to the opinion of a medical source depends, in part, on the professional relationship between the physician and the claimant.    Generally, a treating physician's opinion carries more weight than an examining physician's opinion, and an examining physician's opinion carries more weight than that of a physician who did not examine the claimant but formed an opinion based on a review of the claimant's medical records.    *Holohan*, 246 F.3d at 1201-1202.

A treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.    20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).    If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the ALJ considers specified factors in determining the weight it will be given, including the length of the treatment relationship and the frequency of examination, and the nature and extent of the treatment relationship.    20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).    "Even when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'"    *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)).

The ALJ can reject a treating or examining physician's opinion that is inconsistent with the opinions of other treating or examining physicians, if the ALJ makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.    *Thomas*, 278 F.3d at 957.    The opinion of a non-treating or non-examining physician by itself does not constitute substantial evidence to reject the opinion of a treating or examining physician.    *Lester*,

Page 34 – OPINION AND ORDER

81 F.3d at 831.    However, it may constitute substantial evidence if it is consistent with other

evidence in the record.    *Thomas*, 278 F.2d at 957.    An uncontradicted opinion may be rejected

only for clear and convincing reasons.    *Id.* at 956-57.

Plaintiff acknowledges Dr. Khan served as Plaintiff's primary care giver for only a few

months before rendering an opinion; therefore, according to the factors, Plaintiff concedes Dr.

Khan's opinion is entitled to less weight than a treating provider with a longer treatment record

and greater familiarity with Plaintiff.    (Pl.'s Br. at 15-16.)    However, Plaintiff notes there is no

opinion from such a treatment provider; rather, the ALJ relied on and gave great weight to the

initial determination of non-examining State agency physicians that only reviewed evidence

available from July and November of 2015.    (Pl.'s Br. at 16.)    The Commissioner argues the

ALJ's gave proper reasons for according Dr. Khan's opinion little weight.    (Def.'s Br. at 10-11.)

Here, first, the ALJ gave Dr. Henderson's assessment little weight.    (Admin. R. at 20.)

Dr. Henderson saw Plaintiff for a consultative examination in July 2015.    (Admin. R. at 341-44.)

Dr. Henderson completed a comprehensive musculoskeletal exam for arthritis, foot deformity,

cirrhosis and neuropathy.    (Admin. R. at 341.)    With respect to Plaintiff's gait, Dr. Henderson

noted he rose out of his chair easily and displayed a mild bilateral antalgic gait, walking somewhat

flat-footed.    (Admin. R. at 342.)    Dr. Henderson wrote Plaintiff could weight-bear briefly on his

heels, but he complained of pain going along the ball of the right foot and along the lateral arch.

(Admin. R. at 342.)    Dr. Henderson further noted Plaintiff refused to walk on toes because of fear

of pain in the first toes, and Plaintiff was able to tandem walk and squat fully down, and his station

was erect and symmetric.    (Admin. R. at 342.)    Dr. Henderson also noted there was no swelling,

erythema, signs of infection, or trauma in Plaintiff's ankles and feet, and the skin is intact.

(Admin. R. at 342.)  Dr. Henderson noted moderate to severe bilateral bunions, and the right toe

is somewhat under the right second toe.  (Admin. R. at 342.)  Dr. Henderson further noted on

palpitation there was no tenderness throughout the ankles, and the metatarsal heads were

compressed on the sides and did not produce any pain, but that tenderness manifested when

palpating under the first metatarsal-phalangeal joint bilaterally.  (Admin. R. at 342.)  Dr.

Henderson's assessment read as follows:

> Foot pain:  He complains of having neuropathy, gout and bunions (foot deformity).
> On exam there is tenderness in the first metatarsal heads bilaterally which would
> be consistent with turf toe.  Overall the findings are mild. He did not have any
> neuropathy today.  At this point there is not enough information or a reasonable
> diagnosis that would limit him from walking on ladders as much as necessary.
> Therefore no recommendations can be made to limit standing, walking or climbing
> ladders.  Vision, hearing and fine motor activity are intact.
>
> Cirrhosis:  According to his history this is not impairing to him.  He has cut down
> his drinking, but is still consuming alcohol.
>
> Arthritis:  The history is not clear as to the exact diagnosis.  Exam of the ankles,
> elbows and hands etc. did not show any significant signs of arthritis that would
> impair him from working.   His history of gout does not consistent medically.

(Admin. R. at 343.)  The ALJ gave Dr. Henderson's conclusion that he had no basis for limiting

Plaintiff's work activities little weight and found that "there are sufficient treatment records with

some ongoing complaints to support a need for some restrictions."  (Admin. R. at 20.)

The ALJ gave great weight to the initial determination and little weight to the

reconsideration determination of state agency non-examining medical consultants.  (Admin. R. at

21.)  State agency non-examining medical consultants reviewed the available medical evidence

from July and November 2015.  (Admin. R. at 89-134.)  On initial review, which the ALJ gave

great weight, a consultant found Plaintiff could occasionally lift or carry fifty pounds, frequently

lift or carry twenty-five pounds, stand or walk with normal breaks for six hours in an eight-hour

Page 36  – OPINION AND ORDER

work day, sit with normal breaks for six hours in an eight-hour work day, and climb ramps, stairs, ladders, ropes, or scaffolds frequently (Admin. R. at 89-90, 102-103.)

The ALJ gave little weight to Dr. Khan's opinion.  (Admin. R. at 21.)  Dr. Khan treated Plaintiff in April 2017 and noted "he is due for podiatric procedure repair of his right foot.  Pain from same foot.  Gabapentin is helping with the neuropathic aspect of this" and noted "activity limited due to feet issues which he is getting corrective procedure in near future."  (Admin. R. at 517.)  Dr. Khan also noted "MS/RHEUM no articular or joint PAIN or SWELLING" and "Ext no c/c or pedal edema."  (Admin. R. at 518-19.)  Dr. Khan treated Plaintiff on September 27, 2017 and noted "Prominent medial bunion b/l with hallux under riding the 2nd toe.  More pronounced on the right foot.  No pain or limitation to ROM 1st MPJ.  Hypermobile 1st ray, b/l. 5/5 strength to all 4 ankle quadrants b/l."  (Admin. R. at 616.)  With respect to Plaintiff's stance, Dr. Khan noted "flattening of both arches with moderated midtarsal pronation and + havicular drop sign."  Dr. Khan further noted "diminished sensation to the plantar soles with 10 gm monofilament."  (Admin. R. at 616.)

On September 26, 2017, Dr. Khan wrote his opinion.  (Admin. R. at 591-94.)  In his opinion, Dr. Khan noted Plaintiff could walk a few blocks or ten minutes without rest or severe pain, could sit for more than two hours, could stand for fifteen minutes, and could stand/walk for fifteen to twenty minutes.  (Admin. R. at 592.)  Dr. Khan noted Plaintiff would sometimes need to take unscheduled breaks during a working day and wrote "walk not more than 15-20 minutes," and wrote that how often that would occur was "variable (as related to foot pain)," and that Plaintiff would need to rest "until pain relief" before returning to work.  (Admin. R. at 592.)  Dr. Khan further noted with prolonged sitting Plaintiff's legs should be elevated 25% of an eight-hour

Page 37 – OPINION AND ORDER

workday.  (Admin. R. at 593.)  Dr. Khan noted Plaintiff could climb stairs and climb ladders occasionally and twist, stoop (bend), and crouch/squat frequently, and noted that the "key is duration of bearing weight on his feet."  (Admin. R. at 593.)

As stated above, the ALJ gave Dr. Khan's opinion little weight for the reason that "the reported symptoms are not consistent with the physician's treatment record."  (Admin. R. at 21.) Noting first Dr. Khan's opinion that Plaintiff needs to elevate his legs for 25% of the work day, the ALJ found that the following record evidence contradicted that opinion:  (1) Dr. Khan's own notes which state Plaintiff did not have edema (Admin. R. at 537, 576, 601, 607); (2) other sources that noted no swelling (the ALJ cited only to Dr. Meis's podiatry consult on December 7, 2015) (Admin. R. at 21, 544), and (3) Plaintiff's report of having only intermittent swelling (Admin. R. at 568.)  Further, the ALJ relied on the "limited treating relationship" between Plaintiff and Dr. Khan "dating only to April 2017."  (Admin. R. at 21.)

As a treating physician, Dr. Khan's opinion generally would be entitled to controlling weight, but because of the inconsistencies between Dr. Khan's opinion and other substantial evidence in the record, the ALJ must use specific factors to determine how much weight to give Dr. Khan's opinion.  Those factors include the length, nature, and extent of the treating relationship, as well as supportability, consistency with the record as a whole, and specialization. 20 C.F.R. §§ 404.1527(c), 416.927(c).  Dr. Khan and Plaintiff's treating relationship dates back to April 2017 – before Dr. Khan gave his opinion, he had treated Plaintiff for about six months. The ALJ also noted inconsistencies with the record as a whole.  Therefore, under these factors, the ALJ properly gave Dr. Khan's opinion little weight.

Further, an ALJ may reject a doctor's opinion when it conflicts with the doctor's own notes. *Valentine v. Comm'r of Soc. Sec.*, 574 F.3d 685, 692-93 (9th Cir. 2009). "A conflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider." *Ghanim*, 763 F.3d at 1161 (citing *Molina*, 674 F.3d at 1111-12 and *Valentine*, 574 F.3d at 692-93). Here, part of the inconsistency the ALJ noted was a conflict between Dr. Khan's opinion and his own treatment notes. This is a valid reason for the ALJ to give Dr. Khan's opinion little weight.

To reject a treating physician's opinion that is contradicted, the ALJ needs specific and legitimate reasons based on substantial evidence in the record. A non-examining opinion alone is not substantial evidence, unless it is consistent with other substantial evidence in the record. Here, the ALJ gave great weight to the state agency non-examining medical consultants, which alone is not substantial evidence. However, the ALJ still may properly reject Dr. Khan's opinion based on the factors above, including the inconsistency between Dr. Khan's opinion and his treatment notes. Thus the inconsistencies between Dr. Khan's opinion and other substantial evidence in the record, as well as Plaintiff and Dr. Khan's limited treating relationship, constitute specific and legitimate reasons to give Dr. Khan's opinion little weight and are supported by substantial evidence in the record, such as Dr. Khan's treatment notes, Plaintiff's report of intermittent swelling, and Dr. Meis's treatment notes. "An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Garrison*, 759 F.3d at 1012 (quoting *Reddick*, 157 F.3d at 725). The ALJ has done so here.

III.    Remand

Plaintiff asks the court to credit the evidence wrongly rejected by the ALJ as true and remand this matter to the Commissioner for an immediate award of Benefits. (Pl.'s Br. at 17.) The Commissioner argues there is a conflict in the record and serious doubt as to Plaintiff's disability, and asks this court to affirm the Commissioner's final decision and dismiss Plaintiff's complaint with prejudice. (Def.'s Br. at 13.)

The decision whether to remand for further proceedings or for an immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings and when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r*, 635 F.3d 1135, 1138 (9th Cir. 2011) (quoting *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004)). The court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the act. *Strauss*, 635 F.3d at 1138.

Under the "credit-as-true" doctrine, evidence should be credited and an immediate award of benefits directed where: (1) the ALF has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Strauss*, 635 F.3d at 1138.

Here, the ALJ failed to provide legally sufficient reasons for rejecting Plaintiff's testimony. However, the error was based on the ALJ's failure to provide clear and convincing reasons for rejecting Plaintiff's testimony regarding the intensity, persistence, and limiting effects of his

symptoms.    The RFC assessment outcome is thus an outstanding issue that must be resolved before a determination of disability can be made.

*Conclusion*

The Commissioner erred in failing to specify what portions of Plaintiff's testimony she found not credible or the evidence that, in her opinion, undermined such testimony, and in relying on invalid reasons to reject such testimony.    Therefore, the Commissioner's findings on Plaintiff's disabilities, considering the record as a whole, are not supported by substantial evidence. Accordingly, the Commissioner's decision is REVERSED and REMANDED for further proceedings consistent with this Opinion and Order.

IT IS SO ORDERED.

DATED this _30th_ day of July, 2020.

JOHN V. ACOSTA
United States Magistrate Judge